A. G. Homann v. Commissioner. Anna Homann v. Commissioner.
Homann v. Commissioner
Docket Nos. 37318, 37319.
United States Tax Court
T.C. Memo 1954-227; 1954 Tax Ct. Memo LEXIS 16; 13 T.C.M. (CCH) 1145; T.C.M. (RIA) 54333; December 20, 1954, Filed *16 Harry Ellsworth Foster, Esq., for the petitioners. Francis J. Butler, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in the income taxes of petitioners A. G. Homann and Anna Homann in the amounts of $10,148.95 and $10,457.70, respectively, for the taxable year 1946. The questions to be decided are (1) whether gain realized from the sale of certain houses during the year in controversy should be treated as capital gain rather than ordinary income; (2) if those houses were property used in a trade or business, whether their basis should be reduced by the amount of depreciation allowed or allowable thereon; and (3) whether petitioners omitted from their tax returns for the year in controversy certain gain realized from the sale of furnaces, ranges and refrigerators. An amount received in connection with a construction contract is not now contested by petitioners as being taxable as ordinary income in the year 1946. Findings of Fact Some of the facts have been stipulated and are found accordingly. A. G. Homann, hereinafter called petitioner, and Anna Homann, his wife, resided in Olympia, *17 Washington, a community property state, at all times material herein. They filed separate income tax returns for the years 1945, 1946 and 1947 with the collector for the district of Washington. Petitioner is a general contractor in Olympia, Washington. At the present time he maintains his office in Lacey, Washington, which is about 4 miles east of Olympia, Washington. Petitioner has been engaged in the general contracting business for 30 years, and is a member of the Associated General Contractors of America. Petitioner's contracting business is conducted by him, individually, under the name of A. G. Homann, General Contractor. No one else has any proprietary interest in his business. During World War II, petitioner worked on war projects. Sometime prior to July 1944, the Hanford Engineering Works, hereinafter sometimes called Hanford, requested that 100 single-dwelling homes be built to house 100 of its employees. Petitioner first learned about the proposed project from some friends at the Seattle regional office of the Federal Housing Authority, hereinafter referred to as F.H.A. After finding out about the project, petitioner went to Sunnyside, Washington, and talked to a committee *18 which had been formed to promote the construction of such houses. After investigating what he had heard, petitioner agreed to proceed with the construction of the houses. In or about July 1944, petitioner started construction in 85 single-dwelling houses in Sunnyside, Washington. Another contractor in Sunnyside built the remaining 15 houses desired by Hanford. Petitioner constructed his houses on a tract of land which he purchased, replatted and recorded as Homann's Addition to Sunnyside. At least 100 lots were purchased. F.H.A. required that the lot for each house be not less than 60 feet wide. Petitioner's plat was submitted to F.H.A. and the houses were all approved by that agency. F.H.A. places a ceiling on borrowing in connection with its authorized projects. When petitioner first learned about the project he was told that he could rent or sell only to Hanford employees. Early in the spring of 1945 Colonel Mathias, who was in charge of Hanford, advised petitioners' representative, Beckwith, without previous warning, that the Hanford employees were to be moved to Oak Ridge, Tennessee, and that henceforth there would be no Hanford employees available to occupy the houses. *19 None of the houses were ever rented or sold to Hanford employees. The houses were completed in the spring of 1945. Lawns and shrubs were put in later when the ground was dry enough to work. In order to finance this project, petitioner had borrowed about $450,000 through Sherrill and Roberts, the lending agency for the project. Petitioner paid approximately $20,000 for the land and his own investment in the project fluctuated between $20,000 and $60,000. The amount paid by petitioner for the land and the labor met the minimum requirements necessary to obtain this loan. In May 1944, petitioner also borrowed $45,000 from the National Bank of Commerce in Olympia, Washington. The restrictions on renting and selling solely to the Hanford employees not being effective, petitioner conducted a radio campaign over Station KIT in Yakima, Washington. This program lasted for 2 months and consisted of spot announcements. It was handled by Beckwith and petitioner approved the plan. All of the houses were rented in 1945, before any sales were consummated. Petitioner rented the houses on a month-to-month basis. There were no written leases. There were several oral agreements entered into *20 whereby rent would be credited to the purchase price. These agreements amounted to a rental arrangement with an option to buy. All tenants who wanted to buy could have this arrangement. F.H.A. restrictions through the latter part of 1945 allowed up to 20 per cent of its authorized housing to be sold. The balance had to be rented. Sixteen of petitioner's houses, approximately 20 per cent, were sold in 1945. Sixty-eight of the houses were sold in 1946, after removal of all F.H.A. restrictions on percentage of sales. Only 1 house remained unsold at the end of 1946. This house, the one occupied by Beckwith as an office, was sold in 1947, and a commission of $300 was paid on the sale. All of the houses were sold to individuals. Each purchaser refinanced his purchase, and the proceeds of his mortgage were used to retire the original mortgage loan. Sales were negotiated continuously throughout the years material herein, beginning in April 1945. The sales were closed in groups at irregular intervals because the lending agencies which refinanced the purchases would not process individual mortgage loans, but required petitioner to wait until a group could be accumulated. At all times material *21 herein, the houses were under rent control. This restriction did not change by reason of the removal of the Hanford plant and the elimination of restrictions on public rental. Petitioner has never built any houses on his own account which were sold to others except the houses in controversy herein. He has never had a real estate broker's license. He had never previously built houses on his own account for rental purposes. Horace Miller was a real estate agent in the town of Sunnyside during all years material herein, and served as petitioner's agent in the handling of money transactions. Miller was not the only real estate agent in Sunnyside. Miller was to get a 5 per cent commission for collecting and transmitting rents to petitioner and a 2 1/2 per cent commission on the sale of the houses. He always had authority to sell the houses if he found a buyer. Miller took a deposit on the sale of a house in September 1944. Miller had reason to believe that he was acting in petitioner's behalf. Petitioner reported the gain realized on the sale of the 16 houses sold in 1945 as short-term capital gain. Petitioner had been in doubt as to whether those houses had been held for the 6 *22 months necessary to qualify for capital gains treatment. Those houses were all sold to people who purchased without solicitation. Sales of the 68 houses sold in 1946 were made to people who came in to purchase voluntarily. No "for sale" signs were ever displayed on any of the houses, and such advertisements were not carried in the newspaper. The town of Sunnyside doubled in population during the period in controversy and petitioner's houses were selling without difficulty. At this time veterans of World War II were coming back and wanted homes. Most of the houses were sold to returning veterans. It was not necessary to put "for sale" signs up or to conduct a selling campaign. Miller kept separate account of the income from rentals and the income from sales after August 1, 1945. In 1945, petitioner had started the construction of a cannery building in Olympia on a fixed fee basis for the Midfield Packers, a copartnership, pursuant to an oral contract. The estimated cost of that building was in excess of $200,000. Financial difficulties enveloped the Midfield Packers in the fall of 1945 at which time petitioner had invested between $50,000 and $60,000 in the building. Petitioners *23 filed a lien and instituted suit to foreclose it. The building was only partially constructed at that time. A foreclosure decree was entered and appealed to the Supreme Court of the State of Washington. Judgment of foreclosure was entered September 9, 1949, and upheld on appeal March 9, 1951. Petitioner subsequently completed the building at an additional cost of approximately $96,000. At the time of the hearing herein, petitioner still owned this building. The first floor was rented to the Olympia Brewing Company at a monthly rental of $1,250, and the upper floor was rented to the State of Washington at a monthly rental of $450. Petitioner did not know how much activity was carried on by Miller in selling his 85 houses. Petitioner's superintendent did not know how much sales activity was carried on by Miller. Beckwith was employed by petitioner from 1941 until 1949 as an assistant and in this capacity he had charge of the houses and looked for prospective new business. He was the only employee retained premanently and he lived in one of the houses which served as his office. Beckwith received a weekly wage. The houses were relatively new when they were sold and few repairs *24 were necessary in order to improve the marketability. After the houses were completed petitioner went to the project no more than once every 4 or 5 months. The total cost of the 85 houses according to the Sunnyside books was $515,539.82. Petitioner charged off $94,1335.57 on the 1945 income tax return and $415,298.25 on the 1946 income tax return. On his 1946 income tax return, petitioner also charged off the amount of $18,310.75 under the heading of expenses of sale and cost of improvements subsequent to acquisition. In petitioner's 1945 individual income tax return the sales of the houses were listed under a schedule entitled short-term capital assets. Under the heading of "date acquired" the houses were listed as having been acquired July 1, 1945. Under the heading, "date sold," 15 of the houses were listed as having been sold September 1, 1945, and one house was listed as having been sold August 1, 1945. The respective gain on the sale of these houses in the amount of $10,306.43 was included in income as net short-term capital gain. On a schedule attached to petitioner's 1945 income tax return the cost of the Sunnyside houses was shown at $500,533.57 (84 houses at $5,890 *25 each and 1 house at $5,773.57). On petitioner's 1946 individual income tax return the gain on the sale of the 68 houses was included under long-term capital gains and losses with the date sold being listed as October through December 1946. In 1945, petitioner's income from rents was $4,892.85. His income from sales of the houses was $10,306.43. Rental expenses totaled $9,606.53. Expenses included interest, taxes, insurance and utilities, but nothing for depreciation or salary to Beckwith. In 1946, the income from rents showed a loss of $1,034.25. Repairs were deducted in the amount of $14,828.98 and other expenses totaled $2,454.36. Income from sales in that year was $20,050.98. The houses were originally equipped with refrigerators and ranges. Some occupiers owned their own refrigerators or ranges and did not desire to purchase or rent a house unless these items were removed. Many were removed and sold for salvage value. Petitioner realized $6,218.88 from the salvage of the refrigerators. Petitioners were never in the business of selling secondhand ranges and refrigerators. Some furnaces were defective and removed. $325 was realized from their partial disposition on July 23, 1946. On *26 November 8, 1946, the sum of $350 was realized therefrom. Petitioners were never in the business of selling secondhand furnaces. The houses which petitioner sold in the taxable year 1946 were held primarily for sale to customers in the ordinary course of petitioner's business. Opinion I. Such elements as serve to distinguish , and , on the one hand from , and , on the other preponderate in requiring that the factual question, see , certiorari denied , be determined in respondent's favor. Our ultimate finding accordingly disposes of the primary issue. Unlike the situation in , the original purpose for which the houses in controversy were to be erected was frustrated before the operation really began. The evidence shows that petitioner could not have constructed the houses *27 for rent to the employees of Hanford Engineering Works because the war plant in which they were to be employed had already been located elsewhere. On the contrary even before it was built, one house was tentatively sold in 1944 from the plans. In the years 1945 and 1946 an almost uninterrupted succession of sales [1] took place; so that by the end of 1946 but one house remained and that was sold in the following year. Unlike Victory Housing none were retained for rental when restrictions expired. It is true that the houses were rented upon completion but the tenancies were from month-to-month and the evidence shows that some included an encouragement to the tenant to purchase by not only conferring an option upon him to do so but providing for an application on the sales price of prior rental payments. See *28 The evidence further shows not only that the great bulk of petitioner's income from this venture throughout its duration was from sales rather than rent but that at the level of rent being received no profit could be hoped for; the only means by which the venture was susceptible of final success was the sale of the units. While it is true that petitioner made no direct advertising or promotional drive to dispose of these properties, the factor is neutral since the evidence shows that sales were taking place in the "seller's market" of the period without undue effort. And petitioner did employ a real estate agent who apparently was assured of sufficient business from the venture so that he agreed to accept a commission of only 2 1/2 per cent instead of the usual 5 although it is not clear whether the commission was to be paid on all units sold or only on those in which the broker participated. In either event a considerable, continuous, and constant operation of sales apparently was envisaged. Finally as we have already suggested, the number and continuity of the sales [2] make it almost impossible by any recognized test to conclude *29 that this was not a selling business. Although at one time restrictions were placed upon the number of sales, the implication is that as many sales were made as could be. And the methodical and systematic disposal of the entire development within virtually a 2-year period appears to us to call inescapably for the conclusion of fact set forth in our finding. For the reasons stated we are satisfied that respondent properly charged petitioner with ordinary income rather than capital gain. II. By the same token, however, respondent erred in reducing petitioner's basis on account of depreciation "allowable." Since we have concluded that from the inception petitioner held the property primarily for sale it would not qualify for the "use in trade or business" requirement of the depreciation deduction. In fact, we do not read respondent's contentions as seriously opposing this view. III. Nor do we think the deficiency was proper in failing to include *30 the basis of all but one of the houses in total cost. While one of the exhibits appears to show that 2 houses remained unsold at the end of the tax year other indications satisfy us that this was a typographical error and that only one house remained to be disposed of. We have so found. IV. In placing some of the properties in proper condition it apparently became necessary for petitioner to remove some furnaces, ranges and refrigerators. These were subsequently sold for their salvage value and respondent insists that this income also is ordinary income and not capital gain. We are unable to agree. Whatever petitioner's business as builder, developer and seller of finished houses, he was clearly not in the business of selling used or secondhand equipment. These items were not held for sale in the ordinary course of petitioner's business. Nor is there doubt as to the holding period. The evidence shows that the project was completed in early 1945. The sales in question took place in 1946. It follows that whatever equipment was included in the original properties must have been held more than 6 months when it was ultimately disposed of. Decisions will be entered under Rule 50. *31 Footnotes
1. Petitioner testified that his working capital was frozen in the fall of 1945 and that he could not obtain further bank credit. In spite of this he makes much of the fact that throughout the year 1946 his salable assets upon which all selling restrictions had been removed were not in any way being pressed as a source of capital funds. We find it so difficult to reconcile these two statements that we have omitted any finding of fact based upon them.↩
2. We have been unable to find the details of time and number of sales for lack of evidence. The conclusion, however, seems undisputed, and in any event petitioner cannot benefit by his failure to introduce more specific evidence.↩